IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JERMAINE HENDRIX,              }
                               }
        Plaintiff,             }
                               }       CIVIL ACTION NO.
v.                             }       08-AR-1539-S
                               }
STERILITE CORPORATION,         }
                               }
        Defendant.             }

**MEMORANDUM OPINION**

Plaintiff, Jermaine Hendrix ("Hendrix"), a black male, instituted the above-entitled action alleging intentional race discrimination and retaliation by defendant, Sterilite Corporation ("Sterilite"), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and also in violation of 42 U.S.C. § 1981.[1]  The court has before it Sterilite's motion for summary judgment and its motion to strike portions of Hendrix's evidentiary submission filed with his response brief.  For the reasons that follow, Sterilite's motion to strike will be granted in part and denied in part, and its motion for summary judgment will be granted in part and denied in part.

**FACTS**[2]

---

[1] Since the quantum of proof necessary for Hendrix's claims under Title VII and under § 1981 are identical, the court's treatment of the claims will be identical.  Thus, if Sterilite is entitled to summary judgment on a claim under Title VII, it will be equally entitled to dismissal under § 1981.

[2] Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."  Rule 56(c), F.R. Civ. P.  In accordance with Rule 56(c), the narrative statement of facts includes facts that are undisputed by the parties.  Where

The submissions of the parties, viewed in the light most favorable to the nonmoving party, establish the relevant facts set forth below.

Sterilite, a manufacturer of plastic household goods, maintains manufacturing facilities in several locations throughout the United States, including Birmingham, Alabama. (Doc. 16-1, at 11:21-13:9.)  Hendrix began working at Sterilite's Birmingham plant sometime in 2002 through a temporary employment agency. (Doc. 16-3, at 23:13-24:2.)   In August 2004, Sterilite hired Hendrix as a Packer/Inspector on a full-time basis.  (Doc. 16-3, at 23:6-12; 25:9-20.)  Hendrix was promoted in 2005 to the position of Floor Person, a position which he held until he was promoted to Machinist C in August 2006.  (Doc. 16-3, at 27:15-30:20.)   Hendrix admits that for two whole years, from the time he was placed at Sterilite by the temp agency in August 2004 until August 2006, he never saw or heard anything at work that he considered to be racially offensive or insensitive.  (Doc. 16-3, at 24:4-25:8; 25:21-27:14; 29:2-21.)  It was not until he began working in Sterilite's machine shop in August 2006, where his direct supervisor was Dave Hurley

there is a dispute, the facts are presented in the light most favorable to Hendrix. "The movant 'bears the initial responsibility of informing the district court of the basis of its motion' by identifying those portions of the record that demonstrate the absence of genuine issues of material fact." *Baldwin County, Ala. v. Purcell Corp.*, 971 F.2d 1558, 1563 (11th Cir. 1992) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Thereafter, the burden shifts to the non-movant to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact or that the moving party is not entitled to judgment as a matter of law.  *See* Rule 56(e), F.R. Civ. P.; *see also Celotex*, 477 U.S. at 324.  Conclusory allegations or legal conclusions are not enough.  *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).

("Hurley"), a white male, that Hendrix allegedly began to experience racial harassment. Hendrix's co-workers in Sterilite's machine shop were Tonya Copple ("Copple"), a white female, and Tom O'Neal ("O'Neal"), a white male. (Doc. 16-5, at 3 ¶ 3.)

It is unclear exactly when Hendrix actually began to complain of racial harassment. Hendrix claims that he orally reported racial harassment by Hurley to John Evans ("Evans"), plant manager of Sterilite's Birmingham location, and/or Bob Dupuis ("Dupuis"), assistant plant manager of Sterilite's Birmingham location, on numerous occasions, but that his complaints were ignored and "nothing was done." (Doc. 16-3, at 44:21-46:15.) Sterilite denies that Hendrix ever complained about **any** type of harassment prior to November 19, 2006. (Doc. 25, at 4 ¶ 20.) It is undisputed that Hendrix filed his first **written** complaint regarding Hurley's treatment of him on November 19, 2006, nine (9) days after he was counseled by Hurley for incorrectly reassembling some of the molds used in the manufacturing process. (Doc. 16-4, at 20-21.) In his said complaint, Hendrix did not mention racial harassment, nor did he raise the issue of racial harassment or discrimination in the subsequent meeting held to investigate his complaint. That meeting included Hurley, Evans, Dupuis, and Flora Hollis ("Hollis"), human resources manager at the Birmingham plant. (Doc. 16-4, at 22-25.) Hollis's meeting notes do not reflect any discussion of race, but

do reflect that the meeting ended with Hendrix and Hurley agreeing to try to work together and to move forward.  (Doc. 16-4, at 25.)

Hendrix filed his second written complaint regarding Hurley's alleged mistreatment on June 4, 2007, four (4) days after Hurley again counseled him for incorrectly reassembling molds.  (Doc. 16-4, at 26-29.)  In this second internal complaint, Hendrix, for the first time in writing, complained of racially discriminatory conduct by Hurley, saying that Hurley had "called [him] out of [his] name,"[3] and that Hurley had referred to blacks as "you people." (Doc. 16-4, at 27.)  Hendrix also conclusorily argued that "the reason there is racism is because [Hurley] allows Tom and Tonya to do things he wouldn't allow me to do." (Doc. 16-4, at 27-28.)   Finally, Hendrix claimed that Hurley "threw a metal steel bolt and almost hit me in the eye," that "he wants to jump up in everybodies [sic] face," and that he "blamed me for whatever Tom and Tonya do." (Doc. 16-4, at 27.)  However, Hendrix also said that he loved his job and did not want Hurley to lose his. (Doc. 16-4, at 27-29.)   In the meeting that followed this second complaint, Evans and Dupuis offered to transfer Hendrix to a different shift not supervised by Hurley, but Hendrix declined the

---

[3]  When Hendrix enigmatically says that Hurley "called him out of his name," he apparently means to allege that Hurley used racial slurs.  (Doc. 22, at 12 ¶ 9.)  It would be helpful to know what the slurs consisted of.  If Hurley had called him "BoJangles" or "Stepinfetchit" such appellations would have an obvious racist connotation to a knowledgeable listener.

offer.[4]   (Doc. 17, at 6 ¶ 22; Doc. 22, at 4 ¶ 22.)   Again, the
meeting notes reflect that the meeting ended with the two agreeing
to try to work together and move forward.  (Doc. 16-4, at 32.)

On September 6, 2007, Hendrix filed his third and final
written complaint, the same day that Hurley counseled him again
about improperly reassembling molds.   (Doc. 16-4, at 33-34.)
Hurley also admittedly told Hendrix, at Dupuis's request, not to
use the tools of a fellow employee, purchased by her through
Sterilite's tool purchase plan.  (Doc. 17, at 7 ¶ 24.)  The court
is not sure whether Hendrix considered this racially intolerable.
In his third complaint, Hendrix also alleged that on September 5,
2007, he was eating lunch in the employee break-room when Hurley
and O'Neal entered and asked him what he was eating and if he had
cooked it.  (Doc. 22, at 13 ¶ 12.)  When Hendrix replied that he
was eating barbeque that he had indeed cooked, Hendrix says that
Hurley "then loudly stated to O'Neal 'that nigger can cook.'" (Doc.
22, at 13 ¶ 12.)  Hendrix stated in this complaint that Kathy Moore
("Moore"), one of Hendrix's co-workers, had witnessed this
exchange.  (Doc. 16-4, at 33.)   Hendrix also alleged that Copple
and O'Neal always called him "boy."  (Doc. 16-4, at 33.)  Dupuis,
Evans, and Hollis investigated the lunchroom incident, interviewing
Moore, and others.  Although Moore's account of the incident was

---

[4] Hollis was out of town when Hendrix filed his second complaint on June
4, 2007, and therefore was unable to participate in the investigation, as she
normally did when human resources issues arose, because she claims that the issue
had been resolved by the time she returned.  (Doc. 16-6, at 32:13-33:11.)

consistent with that of Hendrix, she equivocated about whether she had heard Hurley correctly. (Doc. 16-2, at 18.) On September 11, 2007, Evans and Hollis met with Hendrix, Hurley, and Copple to address the internal complaint against Hurley and Copple. (Doc. 17, at 9 ¶ 31; Doc. 22, at 7 ¶ 31.) At that meeting Hurley denied using a racial slur in the lunch room, instead claiming that he had said "this **guy** can cook." (Doc. 16-4, at 36) (emphasis added). Copple admitted that "in response to Plaintiff's questions about whether he would be hanged if he came to Blount County" she answered "probably," although she said she was joking. (Doc. 17, at 9 ¶ 32; Doc. 22, at 7 ¶ 32.) Why Hendrix asked Copple such a question is an unanswered question. It sounds like workplace banter. It was invited by Hendrix. At the end of the meeting, Hendrix reaffirmed that he liked his job generally and his shift specifically. (Doc. 16-4, at 37; Doc. 17, at 9 ¶ 34; Doc. 22, at 7 ¶ 34.)

It is undisputed that "no formal disciplinary action was taken in response to Plaintiff's complaints," because, according to Sterilite, Hendrix's allegations "could not be substantiated." (Doc. 25, at 4 ¶ 16.)

Hendrix and Copple were also involved in a verbal altercation on September 15, 2007, and again on September 16, 2007. (Doc. 17, at 10 ¶¶ 38-39; Doc. 22, at 8 ¶¶ 38-39.) In response to these shouting matches, both Hendrix and Copple were sent home on

September 16, 2007 and both received a one day suspension on September 19, 2007. (Doc. 17, at 11 ¶¶ 39, 42; Doc. 22, at 8 ¶¶ 39, 42.) Hendrix and Copple both returned to work on September 20, 2007. (Doc. 17, at 11 ¶ 42; Doc. 22, at 8 ¶ 42.)

Hendrix filed his first charge of discrimination with the EEOC on September 18, 2007. (Doc. 16-4, at 41; Doc. 17, at 11 ¶ 41; Doc. 22, at 8 ¶ 41.) On September 24, 2007, while Hendrix and Copple were reassembling a mold Hendrix's hand was pinched.[5] (Doc. 17, at 11 ¶ 43; Doc. 22, at 8 ¶ 43.) Hendrix claims that Copple intentionally caused the injury. On September 25, 2007, Hendrix filed his second charge of discrimination with the EEOC, alleging that Copple's act was an act of employer discrimination.[6] (Doc. 16-4, at 43; Doc. 17, at 11 ¶ 45; Doc. 22, at 8 ¶ 45.) How such an act could be laid at the feet of Sterilite was not explained by Hendrix to the EEOC, and has not been explained to this court. Copple was not in a managerial position, and there is no evidence to suggest that Sterilite encouraged or tolerated deliberate injury

---

[5] Both Dr. Siddharth R. Shah ("Dr. Shah"), Sterilite's workers compensation doctor, and Al Hallmark ("Hallmark"), a supervisor in a different area of Sterilite's Birmingham location, observed Hendrix's injury. Dr. Shah described it as a "small laceration" (Doc. 16-5, at 24), and Hallmark described it as a "little cut." (Doc. 16-4, at 44.)

[6] On September 25, 2007, Hendrix also filed a third charge of discrimination with the EEOC, claiming that he was paid less on his previous pay check than he believed he was entitled to. (Doc. 16-4, at 45; Doc. 17, at 12 ¶ 47; Doc. 22, at 9 ¶ 47.) Wisely, Hendrix has abandoned this as one of his allegations of retaliation, because it is clear that his paycheck was reduced pursuant to a garnishment order issued by the Jefferson County, Alabama Circuit Court due to his failure to pay back child support. (Doc. 16-4, at 18-19.)

to a black employee by another employee, white, black, male or female.

On December 12, 2007, Hendrix received his year-end performance review from Hurley in Dupuis's presence. (Doc. 16-10, at 2.) Dupuis once again offered Hendrix a transfer to another department, and once again Hendrix declined. (Doc. 16-10, at 2.)

On January 4, 2008, Hendrix filed a police complaint alleging that Rodney Wade ("Wade"), a black co-worker, had twice pulled a gun on him during the month of December. (Doc. 16-4, at 47-50; Doc. 17, at 13 ¶ 50, 20 n.7; Doc. 22, at 9 ¶ 50; Doc. 22-2, at 8 ¶ 26.) Hendrix filed his police complaint on the same day he was given a verbal warning for failing to follow Wade's directions on December 27, 2007, when Wade was the designated person in charge. (Doc. 16-4, at 101; Doc. 17, at 13 ¶ 49; Doc. 22, at 9 ¶ 49.) Hendrix says that "Wade said [to Hendrix] he had been paid" by Evans to make him drop his EEOC complaints. (Doc. 22-3, at 9 ¶ 26.)

On January 18, 2008, Copple and Hendrix were temporarily assigned to do work on the floor, a procedure that Sterilite claims, without contradiction, was common when there was no work to be done in the machine shop. (Doc. 16-5, at 4 ¶ 12; Doc. 17, at 14 ¶ 52; Doc. 22, at 10 ¶ 52.) Hendrix injured his back that day. (Doc. 17, at 14 ¶ 53; Doc. 22, at 10 ¶ 53.) He claims that when he sought worker's compensation benefits for his back injury "Sterilite management officials denied knowing what worker's

compensation was."   (Doc. 22, at 36.)   However, Hendrix
acknowledges in his deposition that he was actually contacted by a
Sterilite worker's compensation case manager, that he refused to
speak to her, and instead referred her to his attorney.  (Doc. 16-
4, 190:23-191:11.)   Hendrix requested leave under the Family and
Medical Leave Act ("FMLA") for his injury.  (Doc. 17, at 15 ¶ 54
Doc. 22, at 10 ¶ 54.)  On January 28, 2008, Sterilite sent Hendrix
an FMLA packet to be completed in order for his leave to be
processed.  (Doc. 17, at 15 ¶ 54 Doc. 22, at 10 ¶ 54.)[7]  Hendrix
neither returned his FMLA packet by the February 12, 2008 deadline,
nor did he return to work. (Doc. 17, at 15 ¶ 56 Doc. 22, at 10 ¶
56.)  Hendrix claims that by not returning to work he effectively
resigned as of January 18, 2008.  Sterilite claims that he was
terminated on March 28, 2008 for "three days no call/no show."
(Doc. 16-5, at 39; Doc. 17, at 15 ¶ 56 Doc. 22, at 10 ¶ 56.)

On August 26, 2008, Hendrix filed his complaint in this court,
alleging violations of Title VII and § 1981.[8]  (Doc. 1.)  Sterilite

---

[7] In his response to Sterilite's statement of undisputed facts, Hendrix
claims that he "[c]annot admit or deny" whether the factual allegations contained
in paragraph 54 are true.  Because the Federal Rules do not provide for such a
response, the court deems his response an admission.

[8] Hendrix does not attach copies of his right-to-sue letters from the EEOC
to any of the documents he has filed in this action, nor does he allege the dates
on which he received those letters.  Instead his complaint simply alleges that
he "is timely filing this Complaint within 90 days of the receipt of his Notices
of Right To Sue from the Equal Employment Opportunity Commission ("EEOC")."
(Doc. 1, at 1-2 ¶ 2.)  It is unnecessary for the court to determine whether such
an allegation is sufficient to show that Hendrix's claims are timely, because,
in its answer, Sterilite does not dispute this allegation.  (Doc. 8, at 1 ¶ 2.)
Accordingly, Sterilite has waived any objection to the timeliness of Hendrix's
complaint that may have existed.  *Zipes v. Trans World Airlines, Inc.*, 455 U.S.
385, 393 (1982) ("We hold that filing a timely charge of discrimination with the

answered on September 29, 2008.  (Doc. 8.)  After a year's worth of
discovery, Sterilite, on September 21, 2009, filed its present
motion for summary judgment.  (Doc. 15.)  Hendrix responded on
October 21, 2009, attaching his own declaration as an exhibit.
(Doc. 22-2, at 2-10.)  On November 2, 2009, Sterilite filed both
its reply brief and a motion to strike certain portions of
Hendrix's declaration.  (Doc. 25-26.)

**ANALYSIS**

I.   *Sterilite's Motion to Strike*

Before the court can rule upon Sterilite's motion for summary
judgment, it is necessary to rule upon Sterilite's motion to strike
certain portions of Hendrix's declaration.  Rule 56(e) requires
that "[a] supporting or opposing affidavit must be made on personal
knowledge, set out facts that would be admissible in evidence, and
show that the affiant is competent to testify on the matters
stated."  Rule 56(e)(1), F.R. Civ. P.  "Affidavits which fail to
meet the standards set forth in Rule 56(e) may be subject to a
motion to strike."  *Thomas v. Ala. Council on Human Relations,
Inc.*, 248 F. Supp. 2d 1105, 1112 (M.D. Ala. 2003) (citing *Givhan v.
Elec. Eng'rs, Inc.*, 4 F. Supp. 2d 1331, 1334 (M.D. Ala. 1998)).
"However, if an affidavit contains some improper material, the

---

EEOC is not a jurisdictional prerequisite to suit in federal court, but a
requirement that, like a statute of limitations, is subject to waiver, estoppel,
and equitable tolling."); *Myers v. Cent. Fla. Invs., Inc.*, 592 F.3d 1201, 1223-24
(11th Cir. 2010).

court need not strike the entire affidavit, rather it may strike or disregard the improper portions and consider the remainder of the affidavit." *Id.* (citing *Givhan*, 4 F. Supp. 2d at 1334 n. 2.). Hearsay is clearly inadmissible, and upon proper motion it should be stricken.

Hendrix claims that what he says in paragraph 22 of his declaration, namely, that "Al Hallmark, a white supervisor told me that Hurley did not care for African-Americans," (Doc. 22-3, at 8 ¶ 22), and in paragraph 26 that "Wade said he had been paid" to intimidate Hendrix into dropping his EEOC complaints (Doc. 22-3, at 9 ¶ 26) are evidence that constitute admissions of a party under Rule 801(d)(2)(D), F.R. Evid. Under Rule 801(d)(2)(D), a statement is attributable to a party if the declarant is "the party's agent or servant" and the statement is made "concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Statements of supervisors are attributable to the employer if the statements concern the business and the matters in issue. But, does the statement of Hallmark or the statement of Wade fall within this exception? This court thinks not.

Statements of supervisors are attributable under Rule 801(d)(2)(D) only if they are relevant to a matter within the scope of that supervisor's employment. Any statement made by Hallmark regarding whether Hurley liked or disliked black people not only was clearly outside Hallmark's area of responsibility, but such a

11

statement concerned only Hurley's **personal** attitude and cannot constitute evidence of a racist Sterilite policy. If made, the statement by Hallmark falls far short of the Rule 801(d)(2)(D) exception.

Likewise, Hendrix's testimony as to what Wade allegedly said to him, namely, that Evans had told Wade to intimidate him, does not fall within the Rule 801(d)(2)(D) exception. It is hearsay within hearsay. The mere act of placing Wade as the designated person in charge for a limited period of time does not convert him into a Sterilite representative authorized to speak for it or make admissions against its interest. Any subsequent reference to Wade's pulling a gun loses the relevance it may otherwise have had, because there is no way that pulling a gun, even if true, was attributable to Sterilite. If Wade did pull a gun, and Hendrix had produced non-hearsay evidence that Sterilite had put Wade up to it, the pulling of a gun might be relevant because it might be an indication of harassment and intimidation. As it now stands, Hendrix's hearsay bootstrap fails.

Finally, Sterilite asks the court to strike paragraphs 8, 9, 13, 16, 18, 19, 24, and 28 because they are "conclusory and unsupported allegations." (Doc. 26, at 4.) The statements in these paragraphs are not hearsay. Hendrix would be entitled to testify at trial concerning the contents of these paragraphs which are based on his personal knowledge as allowed by Rule 602, F.R.

Evid.  Sterilite's motion will be denied insofar as it seeks to strike paragraphs 8, 9, 13, 16, 18, 19, 24, and 28.

II.  *Hendrix's Hostile Work Environment Claim*

A plaintiff may establish a violation of Title VII based on a hostile work environment by showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  In order to prevail on a hostile work environment claim the Eleventh Circuit has made clear that a plaintiff must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

Sterilite's Rule 56 motion only contests the fifth of these elements.  The other four elements (strangely, including the requirement that the harassment be severe and pervasive) are deemed established for the purposes of Rule 56, despite the fact that, based on the evidence, the severity and pervasiveness of the allegedly abusive conduct is, in the court's opinion, questionable.

In *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), the Supreme Court dealt with the question of what makes an employer "responsible."  It held that an employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee."  *Id.*  However, the *Faragher* court also recognized an affirmative defense for an employer in cases where no tangible adverse employment action was taken against the employee.  An employer can raise as an affirmative defense: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Id.*  "Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action."  *Miller*, 277 F.3d at 1278 (citing *Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir. 2000)).

Credibility is not for the court to decide.  If a jury wants to believe Hendrix's evidence, including all logical inferences, there were **at least** two occasions during which Hendrix could have been subjected to racially harassing remarks, once by Hurley, a supervisor, and once by Copple, a co-worker.  Moore's account of

14

the September 5, 2007, lunch time exchange between Hendrix and Hurley is virtually identical to Hendrix's version. (Doc. 16-3, at 18.)  Sterilite says that the reason why "no formal disciplinary action was taken in response to Plaintiff's complaints" was that Hendrix's allegations "could not be substantiated." (Doc. 25, at 4 ¶ 16.)  Whether the incident of September 5, 2007 constituted workplace harassment, as to which no prompt and reasonable redressive action was taken, is, at this juncture, a matter of legitimate debate requiring resolution by a jury.

The second incident that arguably supports a claim of racial harassment took place on September 11, 2007, during a meeting between Hendrix, Evans, Hollis, Hurley, and Copple, wherein Copple admitted that "in response to Plaintiff's questions about whether he would be hanged if he came to Blount County" she answered "probably," although she told the group she was joking. (Doc. 17, at 9 ¶ 32; Doc. 22, at 7 ¶ 32.)  It is undisputed that Copple and Hendrix continued to work together on the same shift until Hendrix was no longer employed at Sterilite.  Nevertheless, Copple's remark could be characterized, if barely, as racially hostile, although it was invited by Hendrix's own question.  The fact that she answered Hendrix's question, either honestly, dishonestly, or as a mean and provocative racial remark, is a jury question.  Copple may have been in a position to speak for Blount County, but not for

Sterilite.  What makes Copple's remark admissible is the absence of evidence showing corrective action by Sterilite.

Because Hendrix has presented evidence to create a factual issue as to whether Sterilite "exercised reasonable care to prevent and correct promptly any . . . harassing behavior" in reference to Hendrix's complaint about Hurley's racist remarks, and because a factual issue exists regarding whether Sterilite "failed to take prompt remedial action" regarding Copple's alleged racist remarks, Sterilite's motion for summary judgment will be denied as to Hendrix's hostile work environment claim.  The court's ruling may very well be different in response to Sterilite's anticipated Rule 50 motion at trial when the court will be in a position to decide whether or not Hendrix has presented sufficient evidence to prove severe and pervasive racial hostility and a failure adequately to respond.

III. *Hendrix's Constructive Discharge Claim*

The Eleventh Circuit has held that "[t]o succeed on [a constructive discharge] claim, the plaintiff, who bears the burden of proof, must show that her working conditions were 'so difficult ... that a reasonable person would have felt compelled to resign.'" *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1282 (11th Cir. 2003) (quoting *Pipkins v. City of Temple Terrace*, 267 F.3d 1197, 1201 (11th Cir. 2001)).  Accordingly, a plaintiff's burden is higher than that required to demonstrate a hostile work

16

environment.   This may explain why Sterilite's Rule 56 motion challenges the constructive discharge claim but does not claim an absence of evidence to prove pervasiveness and severity of the allegedly hostile work environment.  A plaintiff must not only show that his work environment was hostile, but that it was so hostile that no reasonable person could be expected to stay on the job despite it.  *See id.* (quoting *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) ("The standard for proving constructive discharge is higher than the standard for proving a hostile work environment.")).  It is axiomatic that a claim for constructive discharge requires the plaintiff to have **resigned.** *See Bryant v. Jones*, 575 F.3d 1281, 1289 (11th Cir. 2009) ("'Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby **forces him to quit his job**.'" (quoting *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 244 (4th Cir. 1997)) (emphasis added)); *see also  Lawson v. Washington*, 296 F.3d 799, 805 (9th Cir. 2002) (holding that constructive discharge only occurs when an employee quits); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) (holding that for an employee to have been constructively discharged the employee must actually quit); *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996) (holding that for an employer's actions to constitute constructive discharge the employee must quit); *Rodriguez-Pinto v.*

17

*Tirado-Delgado*, 982 F.2d 34, 38 (1st Cir. 1993) (holding that employee's constructive discharge claim failed when he did not leave his employment); *Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975) ("This is precisely the situation in which the doctrine of constructive discharge applies, a case in which **an employee involuntarily resigns** in order to escape intolerable and illegal employment requirements." (emphasis added)).

Implicit in the resignation requirement is that plaintiff must show a causal connection between the allegedly intolerable work environment and the resignation. As is true in retaliation claims, the more time that passes between the last incident of allegedly intolerable conduct and plaintiff's resignation, the more tenuous becomes the connection between the two. *See Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989) (holding that the district court's finding that employees did not experience constructive discharge was not clearly erroneous where employer promptly responded to the complaints, and the harassment that the employees here complaining about stopped prior to their resignations a month later); *see also Manatt v. Bank of* America, 339 F.3d 792, 804 (9th Cir. 2003) (holding that the employee was not constructively discharged when the harassment ended in March of 1998 and the employee did not resign until April of 2000); *Montero v. Agco Corp.*, 192 F.3d 856, 861 (9th Cir. 1999) (finding no

constructive discharge where the harassing behavior ended three to four months before the plaintiff resigned).  The length of time between the last alleged intolerable working condition and plaintiff's resignation is not always dispositive of this issue. *See Bryant*, 575 F.3d at 1290 (reinstating the constructive discharge claim of plaintiff who did not resign until seven months after adverse employment action, because defendant exhibited a pattern of adverse employment actions).  In the instant case there is no proof of a pattern of intolerable conduct or of mistreatment of black employees.

Although Sterilite argues that it **fired** Hendrix on March 28, 2008 because he had not reported to work or called in, and attaches as confirmation a notice of his termination dated March 28, 2008, stating "3 DAYS NC/NS" (Doc. 17, at 15; Doc. 16-5, at 39.), it is still disputed as to whether Hendrix, in fact, effectively "resigned" prior to March 28, 2008.  Hendrix claims, if weakly, that he resigned in January.  (Doc. 22, at 10; Doc. 16-3, at 176:16-20.)  He never submitted a written resignation.  Hendrix did not return to work after January.  Evans testifies:  "On January 18, 2008, Mr. Hendrix asked to take FMLA leave.  Sterilite sent him an FMLA packet on January 28, 2008.  Mr. Hendrix did not return his FMLA paperwork or return to work."  (Doc. 16-5, at 6 ¶ 14.)  If Sterilite's paperwork is not fake, it will make it hard for Hendrix to convince a jury that he somehow quit before he was fired.  But,

in Hendrix's deposition, Sterilite's attorney, perhaps inadvertently, suggested that Hendrix resigned.

> Q: Well, let me stop you now. **There is no question that you resigned your job with Sterilite**, right, do we --
> A: I resigned because I feared my life. They made me resign.

(Doc. 16-3, at 176:16-20) (emphasis added).

This colloquy constitutes admissible evidence. Lawyers are agents for the purposes of making admissions against the interests of their clients. Therefore, for Rule 56 purposes the court must assume that Hendrix resigned. A jury may decide otherwise, despite what Sterilite's counsel slipped up and said.

If Hendrix resigned, his statements and actions leading up to his resignation belie his claim that the working conditions were so intolerable that they forced him to resign. Each time Hendrix lodged a complaint in writing, his complaint was investigated. At least twice he was offered a transfer to a different shift. He declined both offers. Although Hendrix now claims that he was racially harassed almost from the beginning of his employment in the machine shop, he repeatedly maintained during that time that he loved his job. In fact, as late as September 11, 2007, Hendrix reaffirmed that he enjoyed both his job **generally** and his **shift specifically**. Hendrix cannot now be heard to argue that he was constructively discharged when Sterilite afforded him at least two opportunities to extricate himself from what Hendrix describes as an intolerably racially hostile environment.

20

The fact that more than five months elapsed between Hendrix's last complaint on September 6, 2007, and his alleged resignation on January 18, 2008, in light of the facts that he repeatedly said that he liked both his job and his shift and that he refused at least two transfers, leads the court to conclude, as a matter of law, that Hendrix's working conditions were not so intolerable that a reasonable person would have been forced to resign.

IV. *Hendrix's Retaliation Claim*

"To make a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in an activity protected under Title VII; (2) he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action." *Corbitt v. Home Depot U.S.A., Inc.*, 589 F.3d 1136, 1156 (11th Cir. 2009) (citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). "'To establish a causal connection, a plaintiff must show that the decision-makers were aware of the protected conduct and that the protected activity and the adverse action **were not wholly unrelated.**'" *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)) (emphasis added). A plaintiff can make out a *prima facie* case of retaliation by showing that the adverse employment action was in close temporal proximity to plaintiff's protected activity. However, in and of itself, to

prove a causal connection, the proximity must be very close, if not virtually instantaneous. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").

It is admitted that Hendrix engaged in protected activity by filing a charge with the EEOC and by invoking Sterilite's internal complaint resolution mechanism.  Therefore, Hendrix has met the first essential element.  However, he has not produced substantial evidence that he suffered an actual adverse employment action as a result of his protected activity.  In his brief, Hendrix describes three separate alleged adverse employment actions, namely (1) his being "sent home after repeatedly complaining of harassment;" (2) his being "demoted to a less desirable position as a Floor Person;" and (3) his being "denied access to his worker's compensation benefits."  (Doc. 22, at 35.)  Hendrix has abandoned all other possible theories of retaliation, and they will not be addressed. *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." (citing *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994))).

While it is true that Hendrix was sent home on September 16, 2007, ten (10) days after he had lodged a complaint regarding racial harassment, there is nothing to suggest that this was an act of retaliation.  It was before he went to the EEOC.  Temporal proximity of ten (10) days is not sufficient to make this a jury question.  Besides, as will appear, there was an indisputably very good reason why he was sent home on September 16.

Assuming *arguendo* that Hendrix has made out a *prima facie* case of adverse employment action in the form of his being sent home on September 16, 2007, he has clearly not met his burden of establishing a *prima facie* case regarding the other two claims of adverse employment action.  He has not offered a scintilla of evidence that either of the other two acts even occurred.  Hendrix was never **demoted** to the position of Floor Person.  Although Evans admits that Hendrix and Copple (who is white) were both occasionally assigned to "work on the floor when the Machine Shop was not busy," there is nothing but Hendrix's bare conclusion that he was "demoted."  The evidence shows that on December 12, 2007, Hendrix was given his year-end performance review by Hurley, his supervisor in the machine shop, and on December 27, 2007, Hendrix ordered new tools for his job in the machine shop.  (Docs. 16-8, 16-9, 16-10.)  Hendrix's ordering tools for his machine shop position is clearly not consistent with a demotion to the position of Floor Person.  It is also clear that any assignment to the floor

23

was intermittent or *ad hoc*.   As a matter of undisputed fact, Hendrix was never "demoted."

Again, there is nothing but Hendrix's bare assertion upon which to base his claim that he was denied access to worker's compensation benefits.   He asserts without corroboration, and without naming any managerial employee, that when he sought access to worker's compensation benefits for the back injury he sustained while temporarily assigned to the floor, "Sterilite management officials denied knowing what worker's compensation was."   (Doc. 22, at 36.)   What officials?   Hendrix admits in his deposition that he was, in fact, contacted by a Sterilite worker's compensation case manager and that he refused to speak to her, instead referring her to his attorney.   (Doc. 16-4, 190:23-191:11.)   This completely contradicts any claim of denial of access to worker's comp. Furthermore, Sterilite has produced the FMLA documents it sent to Hendrix in response to his request for leave stemming from his on-the-job injury.   (Doc. 16-5, at 32-37.)   This claim of retaliation is wishful thinking, at best.   It is that proverbial "Bridge Too Far."

For the purposes of further Rule 56 analysis, Hendrix will be considered to have made out a *prima facie* case of retaliation with regard to his being sent home on September 16, 2007.   However, as to this claim, Hendrix is unable to rebut Sterilite's well-documented legitimate, non-retaliatory reason for the action it

took.  Evans testified, without contradiction, that both Copple and Hendrix were sent home on September 16, 2007, after the verbal altercation between them.   Evans testified,  and documentary evidence confirms, that Copple and Hendrix "got into it," and "became a disruption within the plant."  (Doc. 16-2, at 62:12-13,15; Doc. 16-6, at 21-22.)  Hendrix does not dispute that Copple was also sent home.  Instead, he simply argues "[t]hat Copple was also sent home is of no consequence because she and Hendrix were not similarly situated in that Copple had not complained of racial harassment."  (Doc. 22, at 36.)  This argument completely misses the mark.  The fact that Copple, a white female who had not complained of racial discrimination, received the same discipline that Hendrix received after their shouting match proves that his being sent home had a legitimate, non-pretextual basis, and cannot constitute an actionable act of retaliation.

## CONCLUSION

The court will, by separate order, grant Sterilite's motion to strike insofar as it asks the court to strike paragraphs 22 and 26 of Hendrix's declaration.  In all other respects Sterilite's motion to strike will be denied.  The court will, by separate order, also grant  Sterilite's motion for summary judgment as to Hendrix's claims for constructive discharge and for retaliation under Title VII and § 1981.  In all other respects Sterilite's motion will be denied.

25

DONE this 22nd day of March, 2010.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE